**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHRYN P. MCCORD, individually and on behalf of all others similarly situated, | Civil Action No.  2:23-cv-1098 |
| Plaintiff, | |
| v. | |
| VIATRIS INC., MICHAEL GOETTLER, RAJIV MALIK, SANJEEV NARULA, ANTHONY MAURO, and WALT OWENS, | |
| Defendants. | |

:23-cv-1098

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITES LAWS**

Plaintiff Kathryn P. McCord ("Plaintiff"), by her attorneys, except for her own acts, which are alleged on knowledge, alleges the following based upon the investigation of counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Viatris Inc. ("Viatris" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories by the Company, press releases and other public statements issued by the Company, and media reports about the Company.  Plaintiff believes that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired Viatris common stock between March 1, 2021 and February 25, 2022, inclusive (the "Class Period"), seeking remedies under the Securities Exchange Act of 1934 (the "Exchange Act").  Plaintiff's claims are asserted against Viatris and certain of Viatris' executive officers and directors.

2.      At the outset of the Class Period, Viatris announced a multi-phase plan, the first phase of which that would allow it to, *inter alia*: (i) create a stable revenue base; (ii) realize $1 billion in cost synergies by 2024; and (iii) improve cash conversion and free cash flow generation.

3.      Defendants claimed that Viatris would achieve its first phase goals through, *inter alia*, its strong pipeline of new products, including those in its biosimilars business.  Defendants further represented that Viatris' strong pipeline and business development would offset erosion of the Company's base business.

4.      Throughout the Class Period, the Company falsely represented that: (i) 2021 was a "trough year" for Viatris; (ii) $6.2 billion was the adjusted EBITDA "floor" for Viatris; (iii) its

biosimilars business was a core part of the Company's long-term investment strategy; (iv) it was managing resource allocation to meet its phase one objectives and manage Viatris' base business erosion; (v) base business erosion was being and would continue to be offset by new product launches, including those in its biosimilars business; and (vi) base business erosion was in line with Defendants' expectations.

5.      However, contrary to Defendants representations, the Company was experiencing significantly more competition in its United States complex generics business than disclosed.  As a result, the Company was not able to effectively manage its base business erosion or create a stable revenue base.  Instead, throughout 2021, Viatris total revenues were declining quarter-over-quarter.

6.      On February 28, 2022, before the market opened, Defendants revealed that, in light of the prolonged failure of Viatris' Class Period plan, the Company had decided to undertake yet another significant global reshaping of its business.  Indeed, Defendants unexpectedly announced that Viatris had entered into an agreement to sell its biosimilars business to Biocon Biologics Limited, which was anticipated to close in the second half of 2022.  The Company also divulged that it was seeking to divest additional business assets and focus on developing products in three core therapeutic areas as a part of its global reshaping.

7.      Contrary to Defendants repeated representations, 2021 was far from the Company's "trough year" and an adjusted EBITDA of $6.2 billion was not its "floor."  Indeed, that same day, Defendants announced lower-than expected guidance for fiscal year 2022 with total revenues expected to be between $17.0 to $17.5 billion, adjusted EBITDA expected to be $5.8 to $6.2 billion, and free cash flow expected to be $2.5 to $2.9 billion.  Viatris attributed the lower-than

expected guidance, in part, to competition around key core products and price deterioration in certain markets, including the United States.

8.      On this news, Viatris' stock price declined $3.53 per share of common stock, *or approximately 24%*, from a closing price of $14.54 per share on February 25, 2022, to a close of $11.01 on February 28, 2022.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. §78aa.  In connection with the acts alleged in this Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint"), Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone, and other electronic communications, and the facilities of the NASDAQ Stock Market ("Nasdaq"), a national securities exchange.

11.     This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District.  Viatris is headquartered in this District, with its principal place of business located at 1000 Mylan Boulevard, Canonsburg, Pennsylvania, 15317.

## PARTIES

13.     Plaintiff Kathryn P. McCord purchased Viatris common stock during the Class Period as set forth herein, and in his certification filed herewith.

14.     Viatris is a global healthcare corporation, organized under the laws of the State of Delaware.  Viatris was formed on November 16, 2020 through a combination of Mylan N.V. and Pfizer Inc.'s Upjohn Business (the "Business Combination").  Its common stock trades on the Nasdaq under the ticker symbol "VTRS."

15.     At all relevant times, Defendant Michael Goettler ("Goettler") served as Chief Executive Officer ("CEO") and Director of Viatris.

16.     At all relevant times, Defendant Rajiv Malik ("Malik") served as President and Director of Viatris.

17.     At all relevant times, Defendant Sanjeev Narula ("Narula") served as Viatris' Chief Financial Officer ("CFO").

18.     At all relevant times, Defendant Anthony Mauro ("Mauro") served as President of Viatris' Developed Markets business segment.

19.     At all relevant times, Defendant Walt Owens ("Owens") served as Viatris' Global Head of Research and Development.

20.     Defendants Goettler, Malik, Narula, Mauro, and Owens are collectively referred to herein as the "Individual Defendants."

21.     Viatris and the Individual Defendants are collectively referred to herein as "Defendants."

## CONTROL PERSON ALLEGATIONS

22.     By reason of the Individual Defendants' positions with the Company as executive officers, the Individual Defendants possessed the power and authority to control the contents of

Viatris' annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, and their access to material, non-public information available to them, but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

**SUBSTANTIVE ALLEGATIONS**

## I.    Background

23.    Viatris is a self-proclaimed "new kind of global healthcare company" that was formed on November 16, 2020 through a combination of Mylan N.V. and Pfizer Inc.'s Upjohn Business. Viatris researches, develops, manufactures, and sells, *inter alia*, branded, generic, complex generic, biosimilar, over the counter medicines. The Company touts that its portfolio includes more than 1,400 approved molecules across a wide range of key therapeutic areas.

24.    Viatris reports its financial results using the following geographic regions: (i) Developed Markets (i.e., the United States and Europe); (ii) Greater China; (iii) JANZ (i.e., Japan, Australia, New Zealand); and (iv) Emerging Markets (i.e., the rest of the world). For each geographic area, the Company reports financial results by the following product categories: (i) brand; (ii) generics; and (iii) biosimilars and complex generics.

25.     Following the consummation of the Business Combination, Defendants routinely claimed Viatris was "focus[ed] on ensuring that the Company [was] optimally structured and efficiently resourced to deliver sustainable value to patients, shareholders, customers and other stakeholders." To that end, on January 14, 2021, Viatris announced a multi-phased plan to "Optimize Total Shareholder Return" during the 39th Annual JPMorgan Virtual Healthcare Conference.

26.     During the January 14, 2021 conference, Defendants explained that the first phase of the plan consisted of, *inter alia*: (i) creating a stable revenue base; (ii) realizing $1 billion in cost synergies by 2024; (iii) improving cash conversion and free cash flow generation; (iv) deleveraging its debt to ≤ 2.5x;[1] and (v) paying out greater than or equal to 25% free cash flow in dividends.

27.     Defendants claimed that Viatris would achieve the first phase goals through, *inter alia*, the Company's strong pipeline and new product launches, particularly those in its biosimilar division.  Defendant Goettler also explained, during the January 14, 2021 conference call, that Viatris' strong pipeline and business development would offset erosion of the Company's base business.

28.     Furthermore, throughout the Class Period, Defendants regularly referred to Viatris' "base business," which as explained by Defendant Goettler during a March 10, 2021 conference call with Barclays Bank, PLC ("Barclays"), meant the Company's business excluding one-time events.  A one-time event could cause a loss to revenue, for example, where a Viatris product would experience a loss of exclusivity ("LOE"), which would cause a one-time disproportionate

---

[1]  On March 1, 2021, during the Company's Investor's Day presentation, Viatris announced its goal of paying down $6.5 billion in debt by 2023 as a part of its phase one plan.

depreciation to sales due to competitors entering the market for that particular medicine. Conversely, a one-time event could benefit Viatris, for example, where the Company experienced normalized sales of medicines as the COVID-19 pandemic subsided. As shown in the slide below (which is excerpted from a presentation given on March 1, 2021, and referred to at the March 10, 2021 conference), when extracting all one-time events, the Company's remaining operations consisted its "base business:"



29.     Throughout the Class Period, Viatris' "base business" was routinely subject to eroding performance driven, in significant part, by price competition. However, as Defendant Goettler did on the January 14, 2021 conference call, Defendants consistently reiterated throughout the Class Period that Viatris' new product launches and strong pipeline, particularly that which existed for its biosimilars, would continue to offset base business erosion.

30.    Throughout the Class Period, Defendants also represented that: (i) 2021 was a "trough year" for Viatris;[2] (ii) $6.2 billion in adjusted EBITDA was Viatris' "floor;" (iii) the Company's biosimilars business was a core arm of Viatris that Defendants intended to keep as a long-term investment strategy; (iv) it was managing resource allocation to meet its phase one objectives and manage Viatris' base business erosion; (v) base business erosion was being and would continue to be offset by new product launches, including those in its biosimilars business; and (vii) base business and price erosion was in line with Defendants' expectations.

31.    However, contrary to Defendants representations, the Company was experiencing significantly more competition in its United States complex generics business than disclosed.  As a result, the Company was not able to effectively manage its base business erosion or create a stable revenue base.  Rather, throughout 2021, Viatris total revenues were declining quarter-over-quarter.  As a result, Defendants were forced to sell off the Company's valuable biosimilars business, a sales process that necessarily started during the Class Period.

32.    Moreover, Defendants knew, or were deliberately reckless in disregarding, that Viatris' "base business" was not at a "trough" but was continuing to further erode throughout the Class period.  Indeed, Defendant Malik admitted that throughout the Class Period Defendants had "a granular understanding of the profitability and the performance of any product or SKU at the market and channel" across Viatris' "entire portfolio."  He further noted that Defendants had "classified every product within every market based on its responsive and growth potential."

_____

[2] A trough year refers to the lowest point in a business cycle and signals that a period of growth is forthcoming.

II.    **Defendants' Material Misrepresentations and Omissions**[3]

33.    The Class Period begins on March 1, 2021 when the Company virtually held its first Investor's Day after the Business Combination during which Defendants provided a deep-dive into each of Viatris' business segments to instill confidence in Viatris' ability to meet its stated phase one goals.

34.    Defendant Goettler explained that over the next three years (i.e., the first phase of Viatris' plan), Viatris would focus "on delivering [sic] and rebalancing [its] business, laying the foundation for future durable growth and operating leverage."  He then emphasized, based on Defendants' current and historical understanding on market conditions, that: "***2021 is our trough year***."  To accomplish this, Defendants Goettler and Malik highlighted, *inter alia*, the strength of Viatris' research and development ("R&D") pipeline, particularly that which related to the Company's biosimilars business.  Though, Viatris would disclose that it was shedding off its biosimilars business at the end of the Class Period, Goettler nevertheless reiterated that these initiatives would provide "***long-term durable top line growth and operating leverage***."

35.    Picking up from Defendant Goettler, Defendant Malik highlighted the Company's complex generics and biosimilar portfolio, stating in relevant part:

> And I believe we have already shown that we have those core competencies to excel in this space through some first-to-market successes like generic Advair, generic to the Advair, generic to the Copaxone, ***biosimilar to Neulasta, biosimilar to Herceptin***, and I can go on.

> While we are very proud of our track record, we also believe that we can do a lot more in this space and better serve the patient needs by breaking down these barriers. ***These investments have enabled us to see durable long-term revenue***

---

[3] The alleged false statements are bolded and italicized.  The remaining statements are provided for context.

*streams as compared to the core generics. **And we see this as a core part of our forward-looking Viatris portfolio.***

. . .

***We also continue to remain committed to invest in the biosimilar development programs.*** And Walt will talk in a lot of detail about our biosimilar pipeline, where we are with the pipeline, with the development programs. But I would just like to highlight that we will be extremely focused on our efforts to be the first to the market and believe we are well positioned for several of our key programs in the future.

36.     Defendant Mauro went on to discuss Viatris' Developed Markets segment, emphasizing that the Company "***expect[ed] to see [its] historical low to mid-single-digit erosion continue***." That erosion, he explained, would "be driven primarily by LOEs, but also will be offset by new launches and volume growth[.]" Defendant Mauro also highlighted that Viatris' "***biosimilars [would] continue to be a long-term investment strategy***" for which the Company "project[ed] growth . . . in both developed market regions on a year-over-year basis." Defendant Mauro provided further color around Viatris' Developed Markets portfolio, emphasizing that the segment had:

> [A] diverse portfolio mix of brands, generics and complex generics and biosimilars that are spread across multiple technologies in dosage forms across the 35 countries that make up Developed Markets. ***And we continue to be a market leader in complex generic products,*** where we rank #1 in value, volume and total prescriptions for products like Wixela, glatiramer acetate and XULANE. ***When you look at the stability of our portfolio, you will see, as I have already mentioned, that historical erosion is expected to continue in the low to mid-single digits.***

37.     Defendant Owens further explained that one of the six fundamental R&D strategy pillars for Viatris' business model was "biosimilars with an emphasis on first-to-market opportunities[,]" stating in relevant part:

> ***Expanding our biosimilars platform with an emphasis on being first is our second key strategic pillar.***

...

11

That said, our focus on biosimilars does not stop with our current pipeline programs. Moving forward, we have identified 13 new target development programs, spanning additional therapeutic areas and equating to $57 billion in global brand sales. Combining our existing portfolio with these new biosimilar targets will give Viatris one of the industry's leading biosimilar pipelines with 30 products yielding a global brand value of nearly $161 billion. ***This forward-looking focus on biosimilars***, in combination with our deep science and track record, ***positions us very well for execution in this critical strategy element.***

38.     During the Investor's Day presentation, Defendant Malik also assured the market that Defendants were "***instilling the right internal conditions, disciplines to manage and maximize the business***[.]"

39.     In concluding his prepared remarks during the Investor's Day presentation, Defendant Malik emphasized Defendants' confidence that they were actively managing Viatris' business erosion, such that 2021 was a "trough year[,]" stating in relevant part:

> ***Our disciplined approach*** to understanding our profit growth potential on a granular level and ***strategically managing our resource allocation***, ***coupled with a rigorous performance management process focused on execution and results***, ***gives us the tremendous confidence in our ability to meet our stated objectives.***
>
> . . .
>
> I hope by hearing from this team gave you enough insight to appreciate why ***we are confident that we can manage our base business, manage its erosion in a more diligent way***. *We're extending the profitable life of our existing products and proactively responding to the country-specific changes in our market structure and environment.*
>
> . . .
>
> When taking all of these pieces into consideration, you should have an appreciation about ***our confidence in '21 being a trough year***.

40.     Additionally, Defendant Narula "reiterat[ed] that ***2021 will be a trough year for revenue, adjusted EBITDA and free cash flow***." He further emphasized for 2021, "***base business erosion . . . is almost entirely offset by new product revenue***[.]"  Defendant Narula further emphasized that Viatris was "***focused on balancing between base erosion*** and new products" and

would "***continue to seek opportunities to slow the erosion***, maximize the value of launches, given [the Company's] expanded and diversified platform."

41.     During the question and answer portion of the Investor's Presentation, in response to a question from RBC Capital Markets Analyst Randall S. Stanicky regarding EBITDA, Defendant Narula affirmatively stated "one thing I can clearly tell you [is] that ***our 2021 is the trough year for EBITDA, cash flow, and revenue, and that is what's there and particularly for free cash flow***, we're expecting that to rapidly grow as some of the onetime payments go down."

42.     Defendant Goettler reiterated this point in response to a question from Wolfe Research, LLC analyst Akash Tewari, who was seeking additional clarity around how Viatris was not expecting to see top line revenue growth until 2024 but still maintained that 2021 would be a trough year.  Defendant Goettler stated the following in response: "***[W]e have all the levers in place now to be very confident to say that '21 is a trough year. And as Sanjeev just said, a trough year on revenue, a trough year on EBITDA and definitely a trough year on cash flow***."

43.     Still questioning the Company's ability to balance new product growth with base business erosion and EBITDA, UBS Investment Bank analyst Kevin Caliendo asked, "what my question is, and we're all kind of asking it, saying it in different ways is, do you think that new products can offset base business erosion beyond 2021 on the EBITDA line?"  Frustrated, Defendant Goettler passed the question to Defendant Malik, who responded as follows:

> [L]ook, one of the reasons we wanted to make sure, first of all, you guys ***get comfortable about the '21 being the trough year***. That was one of the objective [sic] today. The second objective was we give you insight into this platform and show you the potential of not ***only these new launches or the revenue synergies offsetting the base erosion***, ***but also our proactively trying to manage the erosion*** because we -- once we get over here, 1% -- if you can erase the decline of 1% tail products, that takes off the pressure of your new product launches, which you have and all those. So there are many levers.

44.     With respect to Viatris' biosimilars division, in response to Barclays Bank PLC analyst Balaji V. Prasad, both Defendants Goettler and Malik emphasized that Viatris was committed to maintaining, stating in relevant part:

> Goettler: Thanks, Balaji, and let me just summarize. ***We have no intention to get out of biosimilars, quite the opposite.*** But let me have Rajiv get more into details on that.
>
> …
>
> Malik: And we will continue to go both ways. We will keep on looking for the partnerships, and we'll keep on building our own competencies. So it's an area for us where we have said this is a global franchise. ***This is an area where we have decided to hang in, not get out. And for us, it's a long-term play, and we continue to make the R&D investments, as well as investments in our commercial infrastructure.*** Because we are very excited what we see ahead in this growing space. So that's my two cents view on the biosimilars.

45.     On March 10, 2021, Viatris participated in a conference call with Barclays Bank PLC during which Defendant Goettler reiterated that 2021 was Viatris' trough year, stating in relevant part: "[w]e also very consistently said that *we see 2021 as a trough year. Now trough year clearly means it's not going to go lower than this, right? And we say trough year, that's for revenue. That's for EBITDA. And it's more certainly for cash flow, right?*"

46.     Defendant Goettler went on to explain what Viatris considered to be its base business and how the "natural" erosion in that business would be offset, stating in relevant part:

> So the one thing, as in we try to be very transparent with it as we gave the guidance on Investor Day, is to separate the kind of special items from the ongoing business. And a lot of the special items like the Lyrica LOE in Japan, like the performance LOE, these will not -- obviously not repeat. In fact, we have no major LOE ahead of us. Lyrica is the last big one. No major LOE in the planning horizon that's in excess of $100 million. So these onetime item's kind of behind us. So what you're left with is the underlying base business.
>
> In the base business, there's a natural erosion. We quantified that for our 2021 guidance. It doesn't mean necessarily that it will be like this every year, right? We have a very different commercial infrastructure now. We've got medical skills. We can get -- we believe we can get more out of the base business that we have.

> *Then you have -- offsetting that erosion, we have new product launches*. Again, that number is not written in stone. We've been running at an average of about $600 million in new product revenue every year. Maybe we can get some more out of that by launching more, launching better.

47.    "[V]ery excited" by Viatris' biosimilars business, Barclays analyst Balaji V. Prasad asked about its development to which Defendant Malik stated:

> *[I]t's a strategic area for us. And if it's a strategic area, we will be looking forward to build the core competencies, which we have been working on.* And our first core competency, which we have been building upon, has been in our science side, R&D side, regulatory, medical affairs, which we have been building up.

48.    Defendant Malik went further, explaining that biosimilars "will continue to be one of the key growth drivers as we launch more and more of these products in more geographies."

49.    On May 10, 2021, Viatris published a press release, filed with the SEC as an exhibit to a Form-8K signed by Defendant Narula, announcing its financial results for the first fiscal quarter of 2021 and notifying investors that the Company would hold an earnings call that same day.

50.    During the May 10, 2021 earnings call, Defendant Goettler again emphasized that 2021 was in Viatris' "trough year," stating in relevant part:

> And while we're not giving long-term guidance at this time, *we continue to feel strongly that 2021 is our trough year* as defined by the midpoint of our guidance of USD 6.2 billion adjusted EBITDA. *And we believe that, that $6.2 billion is a true floor of our business, not just for this year but also for future years*.

51.    Defendant Malik reiterated Viatris' plan to minimize base business erosion and emphasized that the Company was "off to a great start[,]" stating in relevant part:

> Earlier this year, we shared with you our approach to execute our '21 plan, *minimizing the base business erosion*, executing the new launches, and integrate and synergize. I'm very pleased to inform you that *we are off to a great start*.

15

52.     Defendant Malik further explained during the same call that Defendants had implemented a disciplined approach to assessing its United States generics business that was helping manage the Company's base business more effectively, stating in relevant part:

> I would like to provide a bit more color around our U.S. generics business, which is approximately 11% of our total business now. Our current generics portfolio is now a combination of diversified product forms, including extended-release oral solids, injectables, transdermals and topicals. ***We implemented our disciplined approach to resource allocation and portfolio management, including the rationalization of negative margin products. We believe that extending this approach to our overall business will help us manage our base business more effectively***. Looking ahead, we have assumed increased competition for our complex products like XULANE, Wixela, glatiramer acetate in addition to the loss of exclusivity of performance.

53.     Zeroing in the competitive dynamics Defendants discussed during the May 10, 2021 call, Goldman Sachs Group, Inc. analyst Nathan Rich noted that Viatris' base business erosion was lower than the Company anticipated for the year and questioned how the P&L may be impacted.  In response, Defendant Malik emphasized the strength of the business, stating in relevant part:

> ***And overall on a base business, just also there was a comment on the base business. Our underlying business, Nathan, I can tell you across the geographies, whether I start with the China talk about the Developed Markets, North America, Europe, it's strong. The underlying business is strong.*** The competitive dynamics are exactly what we had. And I assume we see that -- I think the approach we had adopted to manage this base is the key. And our focus will be to optimize, leverage and minimize the base.

54.     During the same call, BofA Securities analyst Jason Matthew Gerberry questioned whether investors should "look at this year's revenue as a trough as well?"  In response, Defendant Goettler stated that Defendants were "highly confident" with "6.2% as a floor[,]" stating in relevant part:

> But the 6.2% as a floor, we're highly, highly confident in because we know all the levers that we can have. We know the robustness of our business and our EBITDA you can put any leverage. ***Free cash flow, high confidence again because we clearly see the growth coming driven by EBITDA and lower onetime costs***. On revenue,

we've got a good understanding of the base erosion that we have in the business. We have a good understanding of the new pipeline revenue we can bring.

55.    In closing the May 10, 2021 call, Defendant Goettler reiterated "[w]e continue to remain confident that '21 is our trough year. And we gave a definition of that. The definition is $6.2 billion in EBITDA as our floor going forward."

56.    On August 9, 2021, Viatris published a press release, filed with the SEC as an exhibit to a Form-8K signed by Defendant Narula, announcing its financial results for the second fiscal quarter of 2021 and notifying investors that the Company would hold an earnings call that same day.

57.    During the August 9, 2021 earnings call, Defendant Goettler emphasized that $6.2 billion in adjusted EBITDA was "a true floor[,]" stating in relevant part: "on [the] last earnings call, I stated that we see *$6.2 billion in adjusted EBITDA as a true floor of our business going forward. And with the momentum we have, this is now clearer than ever*."

58.    Defendant Goettler also expressed his confidence in Viatris' ability to achieve the Company's phase one plan during the question and answer part of the August 9, 2021 earnings call, stating in relevant part: "We continue to manage this business, and *we're getting more and more confident, actually, in our ability, not only to deliver against the plan, but also improve free cash flow conversion*, in addition to the strength you get from the underlying business[.]"

59.    During the call, Evercore ISI Institutional Equities analyst Umer Raffat sought additional information about "key growth drivers" and particularly Viatris' biosimilar for EYLEA.[4]    In response, Defendant Goettler emphasized the strength of the Company's entire

---

[4] EYLEA is a brand name prescription medicine that is injected into the eye to treat retinal diseases.

portfolio of biosimilars, stating in relevant part: "our biosimilar portfolio is strong. ***It's going to be a driver of growth going forward*** and something to be very proud of, right?"

60.     In response to a question from Citigroup Inc. analyst Navann Ty regarding impacts to the business in 2022, Defendant Goettler "reemphasize[d] again" that Defendants "really see ***the $6.2 billion [as a] true floor for this business***."

61.     Finally, in his closing remarks, Defendant Goettler "reiterate[d] again" that ***"$6.2 billion is the true floor of this business in terms of adjusted EBITDA***[.]"

62.     On November 8, 2021, Viatris published a press release, filed with the SEC as an exhibit to a Form-8K signed by Defendant Narula, announcing its financial results for the third fiscal quarter of 2021 and notifying investors that the Company would hold an earnings call that same day.

63.     During the November 8, 2021 earnings call, Defendant Goettler emphasized milestones for Viatris' biosimilars business, including a forthcoming launch of the industry's first interchangeable biosimilar, the filing of a biological application for the EYLEA biosimilar, and the potential to be first-to-market for a BOTOX biosimilar.[5]  In doing so, Defendant Goettler touted that this "strong performance enable[d] [Viatris] to continue to ***execute on Phase 1 on [its] strategic road map***[.]"  He further explained that Defendants "***continue to remain confident that $6.2 billion of adjusted EBITDA is the true floor of our business***."

64.     During the call, Defendant Malik explained that Viatris expected to provide a "comprehensive review" of Viatris' "pipeline and clinical programs, including ***biosimilars***, complex generics and [its] medicines" during the Company's next call.  He further noted that

---

[5] BOTOX is a brand name prescription medicine that is injected into muscles for, *inter alia*, cosmetics purposes.

"[t]hese development programs are expected *to play a significant role in [the Company's] ability to drive organic growth over time*[.]"

65.    Defendant Malik also represented that Viatris' complex generics and biosimilar category purportedly performed within the Company's "expectations" though the Company was experiencing more competition around its complex generics, stating in relevant part:

> *Our complex generics and biosimilar category performed in line with our expectations*. We are pleased with the continued growth of our global biosimilars portfolio this quarter, which grew by 14% and helped to offset anticipated competition related to select complex generics products.
>
> . . .
>
> Moving to North America, we are very pleased with our overall performance. . . .
>
> *Complex generics and biosimilars in North America was better than our expectations with strong performance in biosimilars*, which helped to absorb the competitive impact on Wixela and XULANE
>
> . . .
>
> Accordingly*,* as we normalize this quarter for exceptional onetime events like dimethyl fumarate, Wixela and XULANE, *our price erosion for this quarter is mid-single digits and very much in line with our expectations.*

66.    Defendant Narula echoed Defendant Malik, stating in relevant part:

> Base business erosion includes price and volume decline in our North American generics business, including competition across complex products such as Wixela, XULANE, Miacalcin and our generic for Tecfidera. Coupled with declines in our ARV business in emerging markets, on balance, *these items are tracking in line with our expectation, and full year assumption is unchanged at approximately 4%.*

67.    During the question-and-answer portion of the November 8, 2021 earnings call, Defendant Goettler "reconfirm[ed] again" that "$6.2 billion is the floor."  He further explained that Defendants were "confident" Viatris could "deliver on [its] Phase I commitments[,]" stating in relevant part:

> [W]e're reconfirming again what we said before, *the $6.2 billion is the floor. That means floor. It doesn't mean that's part of the guidance. It's a floor.* But that's a

floor that's very, very important because that drives how we can deliver on Phase I, right? We laid out our clear priorities, what we need to do. EBITDA drives cash flow, it's not the only thing that's driving cash flow, it's one of the things driving cash flow, and *remain confident that the EBITDA*, combined with, and you can easily do the math yourself, $8 billion or more in cash flow over those 3 years, *sets us up to deliver on our Phase I commitments. We remain confident we can do so*.

68.     After being asked about "base U.S. generics business" and "overall U.S. small molecule retail presence" during the call, Defendant Malik represented that erosion was in line with the Company's expectations after normalizing for competition, stating in relevant part:

I think we feel good how we are all excited about this business. *And if we normalize the onetime events like Tecfidera's LOE or loss of the exclusivity of Wixela and XULANE lane, we are right at where we forecasted, mid-single-digit price erosion.* So thanks for your question.

69.     During the same call, Goldman Sachs Group, Inc. analyst Nathan Allen Rich asked Defendant Narula whether he could provide a preview of any tailwinds or headwinds for 2022.  In response, Defendant Narula stated: "there is *nothing I see that concerns me regarding the underlying fundamentals of the business getting into Q4 or, for that matter, exiting this year into beginning of next year*."  Defendant Goettler responded as well, highlighting that the upside to Viatris' business was its pipeline, stating in relevant part:

And on the upside, it is the pipeline, the upcoming launches. I think we're going to lay out to you on Investor Day how *the pipeline is really one of the most underappreciated assets that we have and our ability to generate really, really strong cash flow. So we're confident in our ability to deliver on all of our Phase I commitments that we laid out*.

70.     On December 1, 2021, Viatris participated in a conference with Evercore ISI Institutional Equities, during which Defendant Goettler reemphasized the Company's plan, stating in relevant part:

I think our strategy has been very clear we laid it out, right? We break it into 2 phases, what we call Phase 1 with year '21, '22, '23. And what we want to focus on there is on delivering, on paying back our debt, on growing the dividend and delivering on the integration and the synergies. *We're well on track for that, and we're strongly committed to that.*

71.     Following up, Evercore analyst Umer Raffat asked about the impact of Viatris' investment in biosimilars and whether that would "set the case for growth" post 2023.  To which Defendant Goettler responded, in relevant part:

> [W]e're going to lay out on our Investor Day exactly how we deliver on our commitments for Phase I. And then we're going to give you the catalyst for the growth in Phase II. ***And the catalysts are our pipeline***, which we think is underappreciated. We've got some ***very strong investments in biosimilars***, in complex generics ***that will drive it***."

72.     Defendant Malik jumped in and provided specifics around Viatris' biosimilars pipeline:

> ***As we go into '23, '24***, it's more than one over there, whether it's the GA once a month, ***whether it's a BOTOX coming in '25, '26, whether it's coming to EYLEA***. So those launches, I think, the concentration of those complex launches starts building up. And also, you would see the contribution of '22, '23 launches is not going to fade out. So I'm very excited to share with you guys on the Investor Day what are the catalysts for Phase 2 and how they're going to contribute to the -- and it's going to -- my feel is, once we do all that math, ***it's going to make our base business relatively more durable than it was yesterday or it today.***

73.     In response to a question regarding how inflation would impact the Company, Defendant Goettler explained that the Company had accounted for the "pushes and pulls" on the business, stating in relevant part:

> We've got inflationary pressures. We've got the FX, we've got all these things. But taking all of them into account, what I can say, and again, we're not giving guidance, the guidance will come on January 7, but ***we remain confident that the $6.2 billion we put out there as a floor, continues to be the floor. And that's really for EBITDA, adjusted EBITDA. And that's really an important number because that floor of adjusted EBITDA allows us to deliver on our commitment***, allows us to generate $8 billion or more in cash flow over the 3 years. And with that, pay down the debt and grow the dividend, which is a commitment that we had for the Phase I. So I think that's the bottom line picture here. There are lots of pushes and pulls on that, but ***we're very confident in delivering on that.***

74.     In response, Evercore analyst Umer Raffat pushed for additional assurance that the Company had the levers in place to ensure EBITDA strength.  Defendant Goettler reiterated in response: "***the $6.2 billion is the floor and we're confident in that***."

75.     The statements in paragraphs ¶¶ 34-74 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was experiencing significantly more competition in its United States complex generics business than disclosed; (ii) the Company was not able to effectively manage its base business erosion or create a stable revenue base; (iii) despite being one of the Company's only growth drivers, Viatris was actively planning to divest its biosimilars business in order to secure enough cash to let it purportedly meet its phase one goals; (iv) Viatris was deviating from the business model it touted through the Class Period and undertaking a significant global reshaping of its business which would undermine its ability to achieve stable revenue growth; and (v) the Company was anticipating less financial growth moving into 2022. As a result of the foregoing, Viatris' public statements were materially false and misleading at all relevant times.

### III.     The Truth Emerges

76.     On February 28, 2022, before the market opened, Defendants revealed that the Company had abandoned key components of its Class Period phase one plan.  Indeed, Defendants unexpectedly announced that Viatris had entered into an agreement to sell its biosimilars business to Biocon Biologics Limited, which was anticipated to close in the second half of 2022.  The Company also divulged that it was seeking to divest additional business assets and undertaking a significant global reshaping of its business, which would focus on developing products in three core therapeutic areas: ophthalmology, gastrointestinal and dermatology.

77.    Far from 2021 being its "trough year[,]" Defendants announced lower-than expected guidance for fiscal year 2022 with total revenues expected to be between $17.0 to $17.5 billion, adjusted EBITDA expected to be $5.8 to $6.2 billion, and free cash flow expected to be $2.5 to $2.9 billion.  Viatris attributed the lower-than expected guidance, in part, to competition around key products, price deterioration in certain markets, foreign exchange impacts, inflation, and a lower adjusted EBITDA margin for the biosimilar business due to its partnership structure and profit-sharing arrangements.

78.    Analysts were shocked.  For instance, during the Company's earnings conference call that day, JPMorgan Chase & Co. analyst Christopher Thomas Schott questioned what "triggered . . . this divestiture strategy." He continued:

> **It seems like it's a bit of a departure from kind of the broader portfolio that was created with the original Upjohn-Mylan transaction**. So I was just trying to figure out, is this a valuation-driven decision as you consider what some of these assets could be worth relative to where Viatris' stock is trading today? Or is this something that, as you look to the performance of the business and as you just had about a chance to understand some of these assets, that it's, I guess, more of a -- you see more of a need to focus in the portfolio? **I'm just trying a little bit about how much of this is strategic versus how much of this is kind of opportunistic in terms of where valuations are.**

79.    Defendant Malik's response, which was in stark contrast to Defendants' Class Period representations emphasizing the biosimilar business importance to the Company, intimated that the biosimilars business was not a "must-have[,]" stating in relevant part:

> We took a hard look on some products. What products make sense? What products don't make sense? **Now we took a hard look on our businesses. We are taking a hard look on the businesses. We are evaluating what are the must-haves as we go along**, what fit in with the long-term strategy and maybe some other focus player has a more – can put a more value to that.

80.    Defendant Goettler similarly stated, in reference to biosimilars: "It's a question of is it core and noncore for the future of our business going forward?"

81.     Noting that the Company's guidance was lower than the "floor" previously provided, Barclays Bank PLC analyst Balaji V. Prasad questioned what caused the change:

> [O]n the guidance, as we look at 2022 guidance, I remember Rajiv, **you had called out $6.2 billion as the floor in the last call? And that seems to be the higher end of the range now.** So what's changed to have this delta and believe that this includes the biosimilars business as part of 2022.

82.     Defendant Narula provided additional purported justifications regarding the Company's EBITDA guidance, each of which Defendant Goettler previously represented the Company accounted for (*see* ¶ 73), stating in relevant part:

> [O]n the EBITDA, I tried to explain that on Chart 59. So what's going on? There are 2 important factors that are not unique to Viatris, but that's the industry-wide. **First is obviously foreign exchange**. Our business is 70% international business. As you know, as seen second half of last year and beginning of this year, dollar has strengthened. Key currency that we have is euro and yen. So that all is causing at about a 2% headwind on [our EBITDA] and I showed that in the chart, that's about $120 million. So that's one factor.
>
> **The second factor is the inflation on the input cost.** This is on the third-party supply, whether it's the [solvents], the -- all the third-party procured APIs, distribution cost, all that is causing an increase in the cost, which is again an industry-wide, and I tried to clarify that on the chart. That's about $196 million. So these factors, again, put together, is causing the -- have been considered in coming out of the guidance, where you see the midpoint is at $6 billion.

83.     BofA Securities analyst Jason Matthew Gerberry continued to press the Company on the abrupt change in strategy and sub-floor guidance, stating in relevant part:

> **Just coming back on the divestitures**. So I think it sounds like the plan would be to get rid of some of the lower-quality, low-margin businesses that at multiples that are well above the current blended company multiples. So I just wanted to confirm that. **And where are you at in terms of the process with these divestitures? It sounds like in order to put out a slide deck like this, presumably, you guys are pretty far along to have gotten some line of sight that these valuation multiples are truly attainable.** Just trying to get a sense if you have conviction in these numbers and these multiples?
>
> **And then just on the EBITDA, if I could come back to that for a second. I guess the Street perceives you guys as guiding to beat based on last year. And so just trying to get a sense of conservatism because, yes, perhaps costs went up, but you had the opportunity to pull forward cost synergies.** You've got the Restasis [ going

1 ] AG to compete against. So seemly you've got some benefits as well. So just curious if you can speak to some of the puts and takes to the upside there.

84.    In response, Defendant Malik reiterated that the Company's divesture plan was focused on "what's core, what's not core[.]"  Defendant Narula addressed the EBITDA question and in doing so, pointed yet again to impacts that the Company had already represented had been accounted for, stating in relevant part: "on the EBITDA, I think there's not much to add, except that I talked about those 2 factors, inflation and FX, that's industry-wide."

85.    Sanford C. Bernstein & Co., LLC analyst Aaron Gal sought additional clarity regarding Viatris' base business erosion rate and the unexpected shift in strategy, stating in relevant part:

> So I want to touch on 2 or 3 things. ***First of all, the baseline business. I'm aware that the generic business typically has its kind of a 5% erosion rate, but I was thinking that your international off-brand business is a lot more stable than that. Is the 5% you're giving us just a result to your projection for 2022?*** Or should we just think long term about that international business on existing products as facing a 5% erosion over time?
>
> And then second, ***you're kind of doing a kind of a big shuffle here, I was kind of under the impression that your strategy was. We have this global presence. We're just going to license products from [indiscernible] companies and put that on that basis and that will be our strategy. And now you seem to be kind of shifting this to focus on specific 3 areas, one of which you would probably pick. Is that false strategy is simply not viable?*** Can we simply not take therapeutic-agnostic products and launch them globally using your infrastructure?

86.    Defendant Malik responded to the question regarding erosion as follows:

> ***[T]he blended -- if I say that if you put all the businesses together, that's where we are saying that blended erosion is around 4%, 5%. That's the 5% you are talking. And you're right, generics can have a component of 5%, 6%, and the LOEs have maybe 3% to 4%, not exactly at that level. And I'll tell you, I mean I'm pleasantly surprised by how much we have been able to hold it.*** And 1 year, because of the -- and I'm not looking at this as an excuse. I think this is going to be a year when we are going to be out there in a normalized way when our people can get out and all that. So there has been some movements over there. But I would say roughly, you should look into the brands at about 2%, 3%, 4%. Japan is a one key one where the price erosion on these brands is a significant one, and we have that.

So if you come out of the Japan and go to emerging markets and all that, it's not that much. So once we, I think, bottom out that, that's one piece.

87.    In response, Defendant Goettler back pedaled away from Defendants' prior representations that its diversified portfolio was a key strength for the Company, stating in relevant part:

I mean, Ronny, we're not walking away from anything here. There's absolutely -- we're going to be a company that's balanced, right? That has a balance of generics, complex generics, off-patent brands. And what we're into at now is this innovative, higher-margin, more durable portfolio. That's an add, that's an end, right? *And if you do that, if you go into that innovative space, you have to do it in a focused way. You cannot build therapeutic area leadership by having -- being in 7 different therapeutic areas.* You get benefits from having commonality of customers, connection with scientific community, development expertise. That's the fly we were trying to build here.

88.    Surprised by Defendants' disclosures that the Company's new product development would not include the biosimilars business, Goldman Sachs Group, Inc. analyst Nathan Allen Rich asked:

I guess, I was -- just wanted to ask around the growth outlook from new products. *I guess, you said a $600 million this year, I guess, $200 million of that is biosimilars. I think some of the key launches this year are also in the biosimilar space. So I guess, moving forward, how do we think about like the cadence of revenue from new products?* I think you had previously targeted kind of $600 million to $700 million. *How does that change as we think about the growth algorithm going forward, given the biosimilar divestiture that you announced yesterday as well as the new kind of NCE strategy going forward.*

89.    Similarly, BMO Capital Markets Equity Research analyst Gary Jay Nachman questioned whether the biosimilars market was really cooling off and what the impact to Defendants' complex generics would be after stripping out biosimilars from the business segment, stating in relevant part:

First, *by divesting biosimilars, does that impact the rest of the complex generic portfolio in any way by not having that combined offering for customers under the same roof?* I'm curious how you think that dynamic is going to play out. And then Rajiv, *I think you mentioned biosimilars are approaching a mature phase. Is that the case? I thought we were just sort of scratching the surface there in*

*terms of biosimilars. So how are you thinking about unlocking the value of that business now?*

90.    In response, Defendant Malik attempted to distract away from the question by discussing the Company's new R&D initiatives, but admitted that Viatris' long term outlook would exclude biosimilars revenue: "we are still a pretty broad portfolio, a very deep portfolio, and more importantly, a deep pipeline. *So yes, couple of years from now, the biosimilars will not be a part of it*, but we're going to continue to add more products so that we are meaningful."

91.    On this news, Viatris' stock price declined $3.53, *or approximately 24%*, from a close of $14.54 per share on February 25, 2022, to a close of $11.01 on February 28, 2022.

92.    Defendants' corrective disclosures caused swift, negative reaction by market analysts. Indeed on March 1, 2022, Raymond James issued a report titled "Downgrading to Market Perform; Outlook Disappoints, Shares Hammered, Déjà vu All Over Again" stating, in pertinent part:

> *The only real constant emerging from the legacy Mylan-Upjohn combination has been the continued ability for EBITDA to shrink despite numerous attempts to draw a line in the sand around a base level from which management was expected to layer in additional growth assets. Reminiscent of last year's investor day in which "absolute business floor EBITDA" guidance of $6.2B also surprised on the downside and was largely viewed as an expectation reset, it is clear now that the business has further room to decline while at the same time management is signaling a hefty shift to more expensive and higher risk development assets as part of its longer-term strategy to pivot towards organic growth.* Initial 2022 EBITDA outlook was south of expectations and while enhanced capital allocation initiatives including establishment of a new $1.0B share repurchase program will afford some short-term recovery from today's battering, our view remains that the story will never "work" absent positive EBITDA growth. Given that our investment thesis was largely predicated on near-term EBITDA stability yielding to modest growth scenarios post 2023, *we are downgrading shares to Market Perform from Outperform as management has signaled another significant reshaping of the business*, one that could significantly extend return-to-growth scenarios as the company accelerates R&D spend to pursue branded strategies in new targeted therapeutic areas.

93.     The Raymond James Report explained that Viatris was now even more of a "show me story[,]" stating in relevant part:

> *Net net, today's release and management outlook have decidedly turned VTRS into much more of a show me story that it was already.* Shares off nearly a quarter of their value from trading following the investor day, continuing to position the company in the bargain bin from a multiple standpoint, *however at this stage given the recent split with primary growth engine coupled with increasing uncertainty around resumption of sustainable EBITDA growth, reliance on mere capital allocation strategies as the primary share price catalyst afford little more than near-term trading opportunities in our view*.

94.     Honing in on the biosimilars business, the Raymond James Report noted that the biosimilars business was "the main source of excitement and future growth, at least on the top-line, in a company that had seen steep base business erosion" and further questioned "at what cost does the deal come? Excluding biosimilars, what growth avenues can VTRS tap into?"

95.     In its February 28, 2022 report titled, "Ugly Guide, With A Lurch To New Strategic Priorities; Remaining Neutral[,]" Piper Sandler noted that Viatris "was throwing in the towel regarding key aspects of the business[,]" stating in relevant part:

> Viatris reported 4Q21 diluted EPS of $0.80 on revenue of $4.34B, compared to Street estimates of $0.83 and $4.35B, respectively. Given the Biocon biosimilars transaction (see below for more details), management's plan to divest other assets that it now deems as non-core, and a pivot to the acquisition of brand assets, *we can only conclude that VTRS, despite all its rhetoric since the closing of MYL/Upjohn merger, is essentially throwing in the towel regarding key aspects of the business model that emerged from that transaction.* We actually endorse this course correction (namely the focus on brands), though *the pivot does create something of a credibility gap (i.e., lurching from strategy to strategy is hardly investor-friendly). A below-the-street 2022 guidance also doesn't help.* Taken together, we remain cautious on VTRS shares given the continued lack of visibility into the longer-term trajectory of EBITDA. We reiterate our Neutral rating.

96.     On March 1, 2022, UBS published a report titled, "Analyst Day Recap: Some Positives But On Balance, More Questions; PT to $12 (from $16)" expressing disappointment in Viatris' guidance given Defendants continual representation that 2021 was a trough year, stating in relevant part:

*Given mgmt's repeated assurance that 2022 would be a trough year, the pivot from the prior guide and sparse financial guidance past 2022 were disappointing*. The investor quandary has been the drivers of y/y improvement amidst lack of blockbusters and generic deflation; post the sale of its biosimilars (historical growth driver) and more divestitures down the line, *this dilemma has only been magnified.* To grow, mgmt foresees $500M in new launches after 2023, portfolio focus and increasing R&D. On the flip side, mgmt expects to divest assets, adding another $300-500M EBIT hole. While cash from the BBL sale affords VTRS flexibility to deliver and cost optimization seems to have a long tail, *we struggle to find enough pluses to offset MSD base business erosion and it seems many of the growth drivers (successful commercialization of complex generics, etc.) are anchored on hypotheticals.* We apply a 6x multiple (current multiple, down from 6.5x) on our NTM+12Me EBITDA, cutting the PT to $12 (from $16).

## ADDITIONAL SCIENTER ALLEGATIONS

97.      As alleged herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Viatris, their control over, and/or receipt and/or modification of Viatris' allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Viatris, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION

98.      During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Viatris' common stock and operated as a fraud or deceit on Class Period purchasers of Viatris common stock by materially misleading the investing public.  Later, when Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, the

price of Viatris' common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Viatris common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

99.    At all relevant times, the market for Viatris' common stock was an efficient market for the following reasons, among others:

a)    Viatris common stock met the requirements for listing, and was listed and actively traded on the Nasdaq, a highly efficient and automated market;

b)    Viatris filed periodic public reports with the SEC and the Nasdaq; and

c)    Viatris regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

100.    As a result of the foregoing, the market for Viatris' common stock promptly digested current information regarding Viatris from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers of Viatris common stock during the Class Period suffered similar injury through their purchase of Viatris common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

101.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Viatris who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

102. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Viatris common stock during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

103. The members of the Class are so numerous that joinder of all members is impracticable, since Viatris has more than a billion shares of stock outstanding and because the Company's shares were actively traded on the Nasdaq. As of May 3, 2023, Viatris had 1,199,029,984 shares issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery,

Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

104.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members, including:

a)    whether Defendants violated the Exchange Act;

b)     whether Defendants omitted and/or misrepresented material facts in their publicly disseminated reports, press releases, and statements during the Class Period;

c)    whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d)    whether Defendants participated and pursued the fraudulent scheme or course of business complained of herein;

e)    whether Defendants acted willfully, with knowledge or recklessly in omitting and/or misrepresenting material facts;

f)    whether the price of Viatris common stock was artificially inflated during the Class Period as a result of the material nondisclosures and/or misrepresentations complained of herein; and

g)    whether the members of the Class have sustained damages as a result of the decline in value of Viatris' stock when the truth was revealed, and if so, what is the appropriate measure of damages.

105.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

106.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

107.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of Section 10(b) of**
**the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

108.    Plaintiff incorporates by reference each and every preceding paragraph as though fully set forth herein.

109.    This Count is asserted by Plaintiff on behalf of himself and the Class against all the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. C 240.10b-5, promulgated thereunder.

110.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Viatris common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Viatris common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

111.    Defendants, by the use of means and instrumentalities of interstate commerce: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and

(iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers and acquirers of the Company's common stock in an effort to maintain artificially high market prices for Viatris' common stock in violation of Section 10(b) of the Exchange Act and Rule 10-5.

112.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information. Defendants' material misrepresentations and omissions as set forth herein violated that duty.

113.    Defendants engaged in the fraudulent activity described above knowingly and intentionally or in such a reckless manner as to constitute willful deceit and fraud upon Plaintiff and the Class.  Defendants knowingly or recklessly caused their reports and statements to contain misstatements and omissions of material fact as alleged herein.

114.    As a result of Defendants' fraudulent activity, the market price of Viatris was artificially inflated during the Class Period.

115.    In ignorance of the true financial condition of Viatris, Plaintiff and other members of the Class, relying on the integrity of the market and/or on the statements and reports of Viatris containing the misleading information, purchased or otherwise acquired Viatris' common stock at artificially inflated prices during the Class Period.

116.    Plaintiff and the Class's losses were proximately caused by Defendants' active and primary participation in Viatris' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company.  Plaintiff and other members of the Class purchased Viatris' stock in reliance on the integrity of the market price of that common stock, and Defendants manipulated the price of Viatris' common stock through their misconduct as described herein.  Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of the true financial condition of Viatris.

117.    Throughout the Class Period, Defendants were aware of material non-public information concerning Viatris' fraudulent conduct (including the false and misleading statements described herein).  Throughout the Class Period, Defendants willfully and knowingly concealed this adverse information, and Plaintiff's and the Class's losses were the foreseeable consequence of Defendants' concealment of this information.

118.    As a direct and proximate cause of the Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of Viatris common stock during the Class Period.

## COUNT II
### Violation of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

119.    Plaintiff incorporates by reference and realleges each and every allegation above as though fully set forth herein.

120.    During the Class Period, the Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports

and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.  Plaintiff and other members of the Class had no access to such information, which was, and remains solely under the control of the Defendants.

121.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware (or recklessly disregarded) that materially false and misleading statements were being issued by the Company and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases and other statements prior to or shortly after their issuance and had the ability or opportunity to prevent their issuance or to cause them to be corrected.

122.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Viatris' business, the information contained in its filings with the SEC, and its public statements.  Moreover, the Individual Defendants made or directed the making of affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and

misleading.  As a result, the Individual Defendants are responsible for the accuracy of Viatris' corporate releases detailed herein and is therefore responsible and liable for the misrepresentations contained herein.

123.    The Individual Defendants acted as controlling persons of Viatris within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Viatris to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Viatris and all of its employees.  As alleged above, Viatris is a primary violator of Section 10(b) of the Exchange Act and SEC Rule 10b-5.  By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

124.    As a direct and proximate result of the wrongful conduct of Viatris and the Individual Defendants, Plaintiff and members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment as follows:

(A)    Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure and certifying Plaintiff as a Class representative, Pomerantz LLP as Class counsel, and Anthony F. Jeselnik as Liaison Class counsel;

(B)    Awarding Plaintiff and the members of the Class damages, including interest;

(C)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including and attorneys' fees; and

(D)    Awarding such equitable, injunctive, or other relief as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands jury trial.

DATED: June 15, 2023                                    Respectfully submitted,

                                            /s/    *Anthony F. Jeselnik*
                                                   _____

                                                   Anthony F. Jeselnik
                                                   Pa. I.D. 20650

                                                   3325 Ivanhoe Road
                                                   Pittsburgh, PA 15241
                                                   Telephone: (412) 860-5636
                                                   afjeselnik@gmail.com

                                                   **POMERANZ LLP**
                                                   Jeremy A Lieberman
                                                   (*pro hac vice* application forthcoming)
                                                   J. Alexander Hood II
                                                   (*pro hac vice* application forthcoming)
                                                   600 Third Avenue, 20th Floor
                                                   New York, New York 10016
                                                   Telephone: (212) 661-1100
                                                   Facsimile: (917) 463-1044
                                                   jalieberman@pomlaw.com
                                                   ahood@pomlaw.com

                                                   *Attorneys for Plaintiff*